UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 07 CR 815-3 |
| | ) | Judge Rebecca R. Pallmeyer |
| ALAN GUZZINO | ) | |

**GOVERNMENT'S RESPONSE TO GUZZINO'S SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby responds to defendant Alan Guzzino's sentencing memorandum as follows.

In asking this Court for a sentence of probation, Guzzino makes several arguments. First, he analyzes the sentencing factors listed in 18 U.S.C. § 3553(a) and argues that these factors favor a probationary sentence. He also argues that additional factors favor a sentence below the advisory guideline range. There are a multitude of flaws in Guzzino's arguments.

**A.    Overview of Facts**

Alan Guzzino agreed to pay kickbacks to Donald Ralls and John Schwab, two officials of the Village of Bolingbrook. The scheme began in the mid-1990s and continued until April of 2006, which is a period of about a decade. In the course of the scheme, Guzzino created and submitted phony invoices to the Village of Bolingbrook. He used the Village's payments on these false invoices not only to pay the kickbacks to Ralls and Schwab, but also *to take money for himself and his business*. In his sentencing memorandum, Guzzino argues that Ralls, who asked Guzzino for the kickbacks, was the "mastermind" of the scheme who "dragged" Guzzino into it. He says that he paid the kickbacks in order to hold on to the Village's business, which he feared would be taken away if he refused to pay the kickbacks. (Mem. at 2, 12-14.) However, it

is important to note that, once the scheme began, Guzzino went beyond simply giving kickbacks to two greedy officials – he also helped himself to a portion of the loot of the crime. And because of his actions, the citizens of Bolingbrook were defrauded of a total of $180,000, of which Guzzino kept $55,000 for himself.

It is also important to note that Guzzino went beyond simply paying Ralls and Schwab an amount of cash, as other vendors did. He alone among the vendors who participated in this scheme actually gave Ralls and Schwab free use of his business credit card, which Ralls and Schwab used to take vacations and make tens of thousands of dollars worth of purchases. By using Guzzino's credit card, Ralls and Schwab used up "credits" that Guzzino gave them from the money that he received from Bolingbrook through his submission of fraudulent invoices. Guzzino even kept an accounting of the "credits" that were to go to Ralls and Schwab, and he reduced the amount of credits by the amounts of purchases that Ralls and Schwab made on the credit card. Such an elaborate and accommodating arrangement was unique among the vendors who participated in the scheme.

Another important fact is that, after Ralls retired from the Village in 2001, Guzzino continued the scheme with Schwab. Thus, years after the scheme began, when the "mastermind" was no longer a threat, instead of ending the criminal activity, Guzzino continued it.

Also of significance is the fact that, when Schwab was fired from the Village of Bolingbrook in April 2006, Guzzino did not come forward to tell either Village officials or law enforcement officials about the terrible scheme that he was "dragged" into. Quite the contrary, when the FBI approached Guzzino in August of 2006 and asked about his relationship with Schwab, Guzzino did not take that opportunity to explain how he had been "dragged" into a

kickback scheme and to thereby assist law enforcement in uncovering Schwab's corruption. Instead, he lied and denied that he participated in any kickback scheme.

    **B.    The Sentencing Factors of 18 U.S.C. § 3553(a) Favor a Guideline Sentence of Incarceration.**

        1.    *Nature and circumstances of the offense; history and characteristics of the defendant (18 U.S.C. § 3553(a)(1))*

As explained above, Guzzino's participation in this offense took place over a *decade*, and it involved a very accommodating arrangement whereby Ralls and Schwab went shopping with Guzzino's credit card, and Guzzino and his business pocketed extra cash – all at the expense of the Village of Bolingbrook, which was defrauded through false invoices that Guzzino fabricated and submitted. And the $180,000 loss to the Village was substantial – it constituted nearly half of the loss suffered by the Village through the entire scheme.

While there is no contention that Guzzino has ever engaged in any other criminal activity, the kickback scheme at issue in this case was not a single instance of misguided behavior – it was ongoing for a significant period of Guzzino's life. And while many family members and friends have written letters attesting to Guzzino's many admirable qualities, he apparently did not confide in them about the illegal lengths to which he went in order to keep Bolingbrook's business. And when he was approached by law enforcement, he made a decision that was not in any way admirable – instead of explaining to federal authorities the circumstances under which he supposedly was "dragged" into crime, he lied to them.

        2.    *The need for the sentence to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense (18 U.S.C. § 3553(a)(2)(A))*

In his sentencing submission, Guzzino does not address the seriousness of the offense that he committed. It cannot be disputed that corruption of government officials is a continuing scourge on the citizens of this District. Without honest government, our society cannot function. Corruption causes citizens to lose trust in their public officials and to become cynical of governmental authority. When the authority of government is thus undermined, the rule of law disintegrates. Such social damage results from corruption at every level of government, even local government. Indeed, in many ways, the corruption of local government is the most damaging to the social fabric because it is at the local level that government authority has the most visible and immediate effect on the daily lives of citizens. And when that authority is undermined, social order is undermined.

While clearly the public officials who accept kickbacks are instrumental in the erosion of the public trust in government, blame also must be placed on those who pay the kickbacks in order to maintain for themselves governmental benefits such as government business.

If sentences imposed on those who participate in the violation of the public trust do not reflect the seriousness of this offense, then public respect for the law is eroded even further. When minimal sentences are imposed, members of the public cannot help but conclude that the justice system places very little value on the notion of integrity in government, and they will naturally do the same. Incredibly, Guzzino argues that a sentence of incarceration in this case will "promote disrespect or animosity toward the law and the concept of justice." (Mem. at 10. *See also id*. at 14.) The government strenuously disagrees and argues quite the opposite – given the nature of the crime, Guzzino's longtime participation in it, and the amount of loss suffered by

the citizens of Bolingbrook, a sentence of probation will unmistakably convey to the public that laws against corruption are not to be taken seriously and can be violated with impunity and with very little consequence.

Given the importance of honest government to the orderly functioning of our society, a probationary sentence for a businessman who, for years, violated laws meant to protect honesty in government and thereby caused substantial monetary loss to the citizens, simply does not provide just punishment for the offense.

> 3. *The need for the sentence to afford adequate deterrence to criminal conduct (18 U.S.C. § 3553(a)(2)(B))*

Given the circumstances of this case, a probationary sentence will not just simply fail to deter criminal conduct, it will actually *encourage* it. In this case, a businessman decided that he could not afford to lose government business and therefore agreed, for a period of years, to pay kickbacks to government officials using government money received by submitting false invoices, of which money he took a healthy percentage for himself. If the consequences of such activity is merely a probationary sentence and restitution, then many businessmen in the same position will make an economic calculation and decide that participating in such an economic arrangement is worth the risk. These message will be that, if they get caught, they will simply have to pay the ill-gotten gains back. As a society, we can hardly afford a mentality that the payment of kickbacks is just a low-risk cost of doing business with government. And it is such a mentality that a probationary sentence will foster.

> 4. *The need for the sentence to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(C))*

Guzzino argues that, at his age and given his life of law-abiding conduct, he will not be engaging in any further criminal activity. Mem. at 7-8. The problem with this argument is the fact that Guzzino's crime was not some youthful indiscretion that was committed in the distant past. Guzzino engaged in a kickback scheme for nearly the entire decade that he was in his 50s, and his participation only ended in April 2006, when Schwab was arrested. And, several months later, he further failed to demonstrate law-abiding conduct when he blatantly lied to federal law enforcement authorities.

> 5. *The need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner (18 U.S.C. § 3553(a)(2)(D))*

Guzzino argues that a probationary sentence is the most effective way for him to "continue mental health treatment which is necessary for his rehabilitation." (Mem. at 11.) However, this statement seems to be at odds with information in the PSR, which indicates that Guzzino has not participated in mental health treatment.

While Guzzino states that he suffers from generalized anxiety, panic attacks, and insomnia, and takes medications for these conditions, such medications would be equally available to Guzzino if he were to receive a prison sentence.

> 6. *The kinds of sentences available (18 U.S.C. § 3553(a)(3))*

Guzzino submits that a sentence of probation and an extensive period of supervised release with stringent conditions would be sufficient but not greater than necessary to comply with the purposes of sentencing under 18 U.S.C. § 3553(a). (Mem. at 1.) For the reasons discussed above, it is the government's position, given the circumstances of this case, that such a lenient sentence would not be sufficient to comply with the purposes of sentencing.

       7.     *The sentencing guidelines (18 U.S.C. § 3553(a)(4) & (5))*

          a)     Allegation of overlapping enhancements

Guzzino argues that USSG § 2C1.1 "causes multiple overlapping enhancements that cover the same conduct." (Mem. at 9.) This is simply inaccurate.

Guzzino appears to claim that, since § 2C1.1(a)(2) has a base level of 12 because his scheme involved public officials, the four-point enhancement that applies under § 2C1.1(b)(3) because Ralls and Schwab were public officials "in a high-level decision-making or sensitive position" is impermissible "double-counting." (Mem. at 9-10.) Guzzino cites no legal authority for this position. Indeed, there is no support for this argument because it is self-evident that the Guidelines logically and rightfully make a distinction between the corruption of low-level government employees and the corruption of high-level government officials, such as superintendents of Public Works agencies, who have a decision-making role in government, such as deciding which vendors will receive government business. When businessmen pay off high-level officials in order to influence their decisions, which is what Guzzino did, the notion of impartial governance is thwarted, and this goes to the heart of whether society operates (or is even perceived as operating) fairly for all.

          b)     Inapplicability of § 5K2.20

Guzzino cites USSG § 5K2.20 and submits that a downward departure from the advisory Guidelines sentence is warranted for "'a single criminal occurrence or single criminal transaction that was committed without significant planning, was of limited duration, and represented a marked deviation from an otherwise law abiding life.'" (Mem. at 8-9.) The problem with this contention is that, as stated above, the facts of this case simply do not fit this provision of the

Sentencing Guidelines.

The crime in which Guzzino engaged was not a single criminal occurrence that was of limited duration. He carried out this scheme for about a decade, paying kickbacks to not just one but to two government officials. And his participation was hardly without significant planning. Guzzino not only gave Ralls and Schwab his credit card to use at will, but he kept an accounting of "credits" that Ralls and Schwab garnered each time Guzzino received ill-gotten gains through his submission of false invoices to the Village of Bolingbrook, and, each month, he offset their use of the credit card against their "credits."

Although there is no indication that Guzzino engaged in any other criminal activity, he engaged in the crime for which he has been convicted for a decade of his life.

Given these facts, § 5K2.20 is inapplicable in this case.

> 8.  *The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (18 U.S.C. § 3553(a)(6))*

Guzzino claims that the amount of loss calculation and the applicable advisory sentencing guideline range in this case -- 46 to 57 months -- "overstates the seriousness of the offense." (Mem. at 10.) He argues that Guzzino "did not profit nearly as much as defendant Schwab and did not design the scheme like defendant Ralls." (*Id*.) However, there are clear distinctions between Guzzino and Schwab. While Schwab clearly profited a great deal and was the main actor in the charged scheme, it was due to his cooperation that the scheme was unveiled. While being questioned about a scheme where Public Works employees misused Village credit cards, Schwab revealed a much larger scheme where five vendors paid kickbacks to government officials over a decade. Schwab then cooperated fully with government

authorities in their investigation of the scheme. Guzzino did not provide such extensive cooperation; indeed, when he was approached by federal agents, he lied.

There are also distinctions between Guzzino and Ralls. At the time the investigation began in April 2006, Ralls had been retired from the Village of Bolingbrook for about five years, and it had been nearly five years since he engaged in the kickback scheme. In contrast, Guzzino was still an active participant. Thus, the only timely charges that were available against Ralls and that were brought before this Court were two counts of tax fraud. In addition, given the time that had passed, very little documentary evidence of the extent of Ralls' participation in the fraud scheme was available. What little documentary evidence remained showed only that he pocketed about $5,000 worth of kickbacks.

> 9.  *The need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7))*

Guzzino argues that "[a] non-incarcerative sentence will also advance the public's interest in receiving restitution." (Mem. at 12.) He claims that, if he receives a sentence short of incarceration, he could make "significant progress toward the restitution amount over time without depleting his families [sic] liquid net-worth and funds available for retirement down the road." (*Id.*) In making this argument, Guzzino does not address the recent case of *United States v. Sawyer*, 521 F.3d 792, 795 (7th Cir. 2008), where the Seventh Circuit decided that district courts must order that *all* of the defendant's assets as of the date of sentencing be *immediately* turned over to be applied toward restitution. *Sawyer* was actually three appeals, two from the Northern District of Illinois (Sawyer and Rogers) and one from the Southern District of Illinois (Duncan), which were consolidated. In the Duncan portion of the appeal, the defendant argued

9

that it was reversible plain error to leave restitution collection up to the Bureau of Prisons (BOP) during incarceration pursuant to the Inmate Financial Responsibility Program (IFRP).

In rejecting Duncan's argument, the Seventh Circuit held that there was no error at all in allowing BOP to collect through the IFRP; indeed, the district court *must* allow BOP to collect unless collection is arbitrary or illegal. 519 F.3d at 795-96. Significantly, one of the premises for deferring to BOP and not setting a schedule for payment during incarceration was the following proposition:

> Because a prisoner's earnings while in custody depend on the Bureau of Prisons, as well as the prisoner's cooperation with its programs, it is not clear what payment schedule a court could set if it wanted. Only assets the prisoner had at the time of his sentence would be available as a realistic matter – and *any existing assets should be seized promptly*. If the restitution debt exceeds a felon's wealth, then the Mandatory Victim Restitution Act of 1996, 18 U.S.C. §§ 3663A, 3664, demands that this wealth be handed over *immediately*; a schedule of payments covers only how much the convict must pay from earnings (and any lump sums such as inheritances) in the *future*.

*Id.* at 795 (emphases added). This instruction of what must be ordered at the time of sentencing – "any existing assets should be seized promptly" – was not *dictum*, but rather a necessary part of the rationale for the Seventh Circuit's holding that the district court in Duncan's case correctly left restitution collection to the BOP during the time of incarceration. In other words, BOP's collection pursuant to the IFRP would not interfere with a court-set payment schedule because there would be *no* court-set schedule to interfere with: the defendant should be entering BOP custody without any other assets. (It is worth noting that, because *Sawyer* overturned prior Circuit precedent, the opinion was circulated to the entire Seventh Circuit pursuant to Circuit Rule 40(e), and no judge voted to hear the case *en banc*. 591 F.3d at 798.)

10

There is a limit to what assets must be turned over immediately to satisfy restitution. Section 3613(a)(1)-(3) exempts certain property from collection enforcement. 18 U.S.C. § 3613(a).[1] For example, § 3613(a)(1) exempts certain categories of property that are exempt from federal tax liens, *see* 26 U.S.C. § 6334(a)(1)-(8), (10), (12). For example, worker's compensation payments and money needed to pay a child-support obligation are exempt. § 6334(a)(7), (8).

The applicability of the exemptions in § 3613(a) was confirmed by the Seventh Circuit in an unpublished disposition issued the same day as *Sawyer*. In *United States v. Riley*, the Seventh Circuit stated that, on remand, the district court must calculate a new restitution amount, and the Court characterized the holding of *Sawyer* as follows:

> As this Court explained in *United States v. Sawyer*, No. 06-1275 (7th Cir. Apr. 9, 2008), a restitution order should require the defendant to turn over immediately all *non-exempt* assets. The statutory schedule deals only with payments out of future income, which must be set high enough that the debt can be paid in full within 20 years.

*United States v. Riley*, No. 07-1386, 2008 WL 961577, at *1 (7th Cir. April 9, 2008) (unpublished disposition cited pursuant to Circuit Rule 32.1) (emphasis added).

Accordingly, what *Sawyer* requires, when combined with § 3613(a), is that the district court must order all non-exempt assets that exist at the time of sentencing to be applied toward restitution. Payment schedules are only applicable to future assets, *e.g.*, future earnings or future lump sums obtained by the defendant. During the time of incarceration, BOP collects through the IFRP, and the district court should not set a schedule for collection during incarceration.

---

[1] By its terms, § 3613(a) applies to judgments imposing a "fine," but § 3613(f) renders the exemptions applicable to restitution judgments.

In the present case, according to the PSR, Guzzino has $212,955 in cash assets, including $80,195 in bank accounts at Harris Bank and U.S. Bank, as well as $75,000 in an Edward Jones IRA account; $25,262 in bonds, stocks and mutual funds managed by Edward Jones Investments; and $32,498 in an IRA with Allstate Life Insurance Company. In addition, he holds a 50% share in the ownership of South Harlem Properties, which 50% share is valued at $671,357. None of these assets are exempt from the requirement of immediate restitution. Thus, the government respectfully requests that the Court include in the J&C the following language: "The defendant must immediately turn over the defendant's non-exempt assets to be applied toward restitution, including but not limited to cash assets located in accounts at Harris Bank and U.S. Bank; financial assets contained in financial accounts managed by Edward Jones Investments, including an IRA account and bonds, stocks and mutual funds; assets contained in an IRA held through Allstate Life Insurance Company; and assets that comprise his 50% ownership in South Harlem Properties. If these assets do not satisfy the restitution requirement, after any term of imprisonment, 25% of defendant's future monthly disposable income will be paid toward restitution. Under 18 U.S.C. § 3664(k), defendant must notify the court and the Attorney General of any material change in the defendant's ability to pay restitution." The second sentence of the proposed language is required by § 3664(k) to be included in restitution orders.

Given the legal requirement that Guzzino immediately surrender his non-exempt assets to satisfy restitution, it cannot be expected that incarceration will interfere with prompt restitution being made to the Village of Bolingbrook.

**C.     Conclusion**

For the foregoing reasons, the government respectfully requests that this Court reject Guzzino's arguments for a probationary sentence and impose a sentence at the low end of the applicable advisory Guidelines range.

                Respectfully submitted,

                **PATRICK J. FITZGERALD**
                United States Attorney

By:    s/Laurie J. Barsella
                **LAURIE J. BARSELLA**
                **STEVEN BLOCK**
                Assistant U.S. Attorneys
                U.S. Attorney's Office
                219 S. Dearborn Street
                Chicago, Illinois  60604
                (312) 353-6069

### CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Crim. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

### GOVERNMENT'S RESPONSE TO GUZZINO'S SENTENCING MEMORANDUM

was served pursuant to the district court's ECF system as to ECF filers, if any, and were sent via facsimile on July 11, 2008, to the following:

| | |
|---|---|
| Ralph Meczyk | Todd McKechnie |
| Attorney at Law | United States Probation Officer |
| 111 W. Washington | 55 E. Monroe |
| Suite 1025 | Suite 1500 |
| Chicago, IL 60602 | Chicago, IL 60603 |
| [FAX 312:782-7074] | [FAX: 312:408-5045] |

  s/Laurie J. Barsella
**LAURIE J. BARSELLA**
**STEVEN BLOCK**
Assistant U.S. Attorneys
U.S. Attorney's Office
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 353-6069